NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

AMERICAN HELICOPTERS, LLC, License No. 20-081332;
MONARCH ENTERPRISES, INC., License No. 03-007141;
PAPILLON AIRWAYS, INC., License No. 03-025046;
XEBEC, LLC, License No. 20-488245;
ZUNI, LLC, License No. 07-618955;
*Plaintiffs/Appellants*,

*v.*

ARIZONA DEPARTMENT OF REVENUE, *Defendant/Appellee*.

No. 1 CA-TX 14-0001
FILED 1-29-2015

Appeal from the Superior Court in Maricopa County
No. TX2012-000231
The Honorable Dean M. Fink, Judge

**AFFIRMED**

COUNSEL

Kolesar & Leatham, Las Vegas, Nevada
By Scott R. Cook, Aaron R. Maurice
*Counsel for Plaintiffs/Appellants*

Arizona Attorney General's Office, Phoenix
By Scot Teasdale
*Counsel for Defendant/Appellee*

---

## MEMORANDUM DECISION

Presiding Judge Patricia A. Orozco delivered the decision of the Court, in which Judge Randall M. Howe and Judge Maurice Portley joined.

---

**O R O Z C O**, Judge:

**¶1**        American Helicopters, LLC, Monarch Enterprises, Inc., Papillon Airways, Inc., Xebec, LLC, and Zuni, LLC (collectively, Taxpayers) appeal the summary judgment the tax court granted in favor of Arizona Department of Revenue (the Department) determining that Taxpayers are liable for use tax and transaction privilege tax.  For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

**¶2**        Papillon Airways, Inc. (Papillon) provides on-demand and scheduled helicopter flights in Arizona and Southern Nevada, including daily scenic air tours of the Grand Canyon.  Papillon leases helicopters from related entities, including American Helicopters, LLC, Monarch Enterprises, Inc., Xebec, LLC, and Zuni, LLC (collectively, the Lessor Entities).  Pursuant to the lease agreements, Papillon is responsible for maintaining the helicopters, including the purchase and installation of "dynamic equipment," an  industry term for engines, rotors, turbines, blades, and other aircraft parts.

**¶3**        The Department audited Taxpayers for the period from January 2003 through December 2006 and assessed use tax against Papillon in the amount of $531,636.32 arising from its purchase and use of dynamic equipment.  The Department also assessed transaction privilege tax against the lease income earned by the Lessor Entities in the amount of $165,043.47 plus interest.

**¶4**        Taxpayers filed timely protests to the proposed assessments. Papillon argued that it was exempt from use taxation pursuant to Arizona Revised Statutes (A.R.S.) section 42-5159.B(7) (West 2015).[1]  The Lessor Entities claimed they were exempt from transaction privilege tax under

---

[1]        Unless otherwise noted, we cite the current version of all statutes when no material revisions have occurred.

A.R.S. § 42-5061.B.7, as extended to lessors by A.R.S. § 5071.B.2(b). The Office of Administrative Hearings consolidated Taxpayers' protests and issued a decision determining that Taxpayers were liable for the assessed tax. Taxpayers appealed to tax court and the parties filed cross-motions for summary judgment. The tax court granted summary judgment in favor of the Department. Taxpayers timely appealed. We have jurisdiction pursuant to Article 6, Section 9 of the Arizona Constitution and A.R.S. §§ 12-120.21.A.1 and -2101A.1. (West 2015).

## DISCUSSION

¶5        We review de novo the grant of summary judgment and construction of the applicable statutes. *Wilderness World, Inc. v. Dep't of Revenue State of Ariz.*, 182 Ariz. 196, 198, 895 P.2d 108, 110 (1995); *Ariz. Dep't of Revenue v. Cent. Newspapers, Inc.*, 222 Ariz. 626, 629, ¶ 9, 218 P.3d 1083, 1086 (App. 2009). "[L]aws exempting property from taxation are to be construed strictly." *Conrad v. Maricopa Cnty.*, 40 Ariz. 390, 393, 12 P.2d 613, 614 (1932); *see also Ariz. Dep't of Revenue v. Capitol Castings, Inc.*, 207 Ariz. 445, 447, ¶ 10, 88 P.3d 159, 161 (2004). Also, "[t]he presumption is against the exemption, and every ambiguity in the statute will be construed against it." *Conrad*, 40 Ariz. at 393, 12 P.2d at 614.

¶6        Arizona's transaction privilege tax is an excise tax on the right to engage in business in the state. *See Ariz. Dep't of Revenue v. Mountain States Tel. & Tel. Co.*, 113 Ariz. 467, 468, 556 P.2d 1129, 1130 (1976). The tax extends to businesses that lease or rent tangible personal property and the tax is assessed against the income generated by the lease. A.R.S. § 42-5071.A-B. The use tax, which is complementary to the transaction privilege tax, applies to the storage, use or consumption of tangible personal property purchased from a retailer and is calculated as a percentage of the sales price. *See* A.R.S. § 42-5155.A. (defining the use tax); *Ariz. Dep't of Revenue v. Care Computer Sys., Inc.*, 197 Ariz. 414, 420, ¶ 25, 4 P.3d 469, 475 (App. 2000) (Fidel, J., dissenting) (explaining that transaction privilege taxes and use taxes are complementary). Here, Taxpayers admit they are engaged in activities that fall within the scope of the transaction privilege tax and the use tax, but assert they are exempt from taxation because Papillon holds a "supplemental air carrier certificate under federal aviation regulations." *See* A.R.S. §§ 42-5061.B.7., -5071.B.2(b), -5159.B.7.

## I.        The Language of the Statutory Exemption

¶7        Both the transaction privilege tax and the use tax provide an exemption for "[a]ircraft, navigational and communication instruments

3

and other accessories and related equipment," provided that the aircraft or equipment is sold to:

> (a) A person holding a federal certificate of public convenience and necessity, **a supplemental air carrier certificate under federal aviation regulations (14 Code of Federal Regulations part 121)** or a foreign air carrier permit for air transportation for use as or in conjunction with or becoming a part of aircraft to be used to transport persons, property or United States mail in intrastate, interstate or foreign commerce.

A.R.S. §§ 42-5061.B.7(a), -5159.B.7(a) (Emphasis added.)  If a sale of aircraft or related equipment is exempt under A.R.S. § 42-5061.B.7., then income realized from the lease of such property is likewise exempt.  *See* A.R.S. § 42-5071B.2.(b).

**¶8**        There is no question that the subject of the assessed use tax (dynamic equipment) and the subject of the assessed transaction privilege tax (helicopters) qualifies as "aircraft, navigational and communication instruments and other accessories and related equipment."  In order for Taxpayers' activities to be exempt from taxation, however, Papillon must hold:  (1) a federal certificate of public convenience and necessity (CPCN); (2) a supplemental air carrier certificate under federal aviation regulations (14 Code of Federal Regulations Part 121); or (3) a foreign air carrier permit for air transportation.  *See* A.R.S. §§ 42-5061.B.7(a) and -5159.B.7(a).

**¶9**        It is undisputed that Papillon did not hold a CPCN during the audited time period.[2]  Likewise, it is undisputed that Papillon did not hold a foreign air carrier permit.  Rather, the parties' dispute whether Papillon held a "supplemental air carrier certificate under federal aviation regulations (14 Code of Federal Regulations Part 121)."  The Department argues that Papillon is *not* a supplemental air carrier and that it operates under Part 135 of the federal regulations, not Part 121.  Conversely, Taxpayers argue that Papillon *is* a supplemental air carrier and that the statute's parenthetical reference to "Federal Regulations, part 121" is not determinative.

---

[2]        Papillon later obtained a CPCN in August 2011.  Since that time, Taxpayers have utilized this statutory exemption.

### A. Papillon Is Not Authorized to Conduct Supplemental Operations Under 14 C.F.R. Part 121.

¶10   In order to operate as an air carrier or commercial operator, a person or entity must obtain an air carrier operating certificate from the Federal Aviation Administration (FAA). 49 U.S.C. § 44705. Papillon holds such a certificate. According to FAA regulations, the carrier must also obtain operations specifications that prescribe "the authorizations, limitations, and procedures under which each **kind of operation** must be conducted." 14 C.F.R. § 119.33(a)(3) (Emphasis added.); *see also* 14 C.F.R. § 119.7(a)(1). "Kind of operation" refers to "one of the various operations a certificate holder is authorized to conduct, as specified in its operations specifications, i.e., domestic, flag, **supplemental, commuter, or on-demand operations**." 14 C.F.R. § 110.2 (defining "kind of operation") (emphasis added).

¶11   The FAA regulations contain numbered parts setting forth the rules applicable to each "kind of operation" as follows:

> Part 121 – Operating Requirements: Domestic, Flag and **Supplemental Operations**. 14 C.F.R. §§ 121.1 to -1500 (Emphasis added.)
> . . .
> Part 129 – Operations: Foreign Air Carriers and Foreign Operators of U.S.-Registered Aircraft Engaged in Common Carriage. 14 C.F.R. §§ 129.1 to -201.
>
> Part 133 – Rotorcraft External-Load Operations. 14 C.F.R. §§ 133.1 to -51.
>
> Part 135 – Operating Requirements: **Commuter and on Demand Operations** and Rules Governing Persons on Board Such Aircraft. 14 C.F.R. §§ 135.1 to -507 (Emphasis added.)
> . . .
> Part 137 – Agricultural Aircraft Operations. 14 C.F.R. §§ 137.1 to -77.

¶12   Carriers authorized to operate under Part 121 can conduct "supplemental operations." *See* 14 C.F.R. §§ 121.1 to -1500. Carriers authorized under Part 135 can conduct "commuter and on-demand operations." *See* 14 C.F.R. §§ 135.1 to -507. Papillon is *not* authorized under

Part 121 to conduct supplemental operations.[3]  Rather, as recognized by the DOT, Papillon is authorized under Part 135 to conduct commuter and on-demand operations.  It is also authorized under Parts 133 and 137 to provide rotorcraft external-load operations and agricultural aircraft operations.

> Papillon provides daily air tour flights from Las Vegas McCarran International Airport, Boulder City Municipal Airport, Grand Canyon West, and Grand Canyon National Park Airport using its fleet of 39 helicopters, all of which are configured for six passengers.  In addition, Papillon provides helicopter transportation services under a fee-for-service contract to several federal and state agencies.  **Moreover, in addition to conducting passenger flights under its Part 135 commuter authority ([nine] or less passengers) and on-demand authority, Papillon holds authority under 14 CFR Part 133 and Part 137 authorizing it to provide external load and agriculture operations.**[4]

---

[3]     If Papillon wanted to conduct supplemental operations under Part 121, it would have to obtain "Part 121 certification from the FAA."  The United States Department of Transportation (DOT) advised Papillon: "In the event that [Papillon] wishes to institute operations that would require **Part 121 certification from the FAA**, it must first be determined fit for such operations." (Emphasis added.)

[4]     Testifying in an unrelated case, Papillon's Chief Operating Officer and Director of Operations described Papillon's authority under the FAA regulations as follows:

> **Papillon is a 135 on-demand charter company** that specializes in chartered air tours over scenic areas, like the Grand Canyon, and other special areas and also has a contracting obligation to several government agencies for exclusive use.
>
> . . .
>
> **Part 135 are the rules that we operate under for the FAA.**  The FAA has Part 121, Southwest Airlines, Delta Airlines, that are on a scheduled route, and then **you have On-Demand 135 charter, which is what we do**.

(Emphasis added.)

**¶13**        Our goal in interpreting statutes is to give effect to each word and phrase. *Indus. Comm'n of Arizona v. Old Republic Ins. Co.*, 223 Ariz. 75, 77, ¶ 7, 219 P.3d 285, 287 (App. 2009).  "The presumption is against the exemption, and every ambiguity in the statute will be construed against it." *Conrad*, 40 Ariz. at 393, 12 P.2d at 614.  With this goal in mind, we interpret the language of A.R.S. §§ 42-5061.B.7. and -5159.B.7. to apply only to an air carrier who:  (1) holds an operating certificate and (2) who is authorized to conduct supplemental operations under Part 121.  Papillon did not have such authority.  Accordingly, during the audit period, Taxpayers did not qualify for the statutory exemption set forth in §§ 42-5061.B.7. and -5159.B.7.[5]

> **B.        By Definition, Rotorcraft Operations Are Not "Supplemental Operations."**

**¶14**        Because Arizona's exemption statutes specifically incorporate the "federal aviation regulations," we apply the definitions found in those regulations.  *Cf. Rios v. Symington,* 172 Ariz. 3, 8, 833 P.2d 20, 25 (1992) (interpreting a state statute in conjunction with the federal statute cited therein).  The FAA regulations define "supplemental operation" as follows:

> Supplemental operation means any common carriage operation for compensation or hire conducted with any **airplane** described in paragraph (1) of this definition that is a type of operation described in paragraph (2) of this definition.

(Emphasis added.)

[5]        Taxpayers contend that the phrase, "a supplemental air carrier certificate" under federal aviation regulations 14 Code of Federal Regulations part 121 is confusing because the FAA issues certificates under Part 119, not Part 121.  We disagree.  Both the FAA and DOT use similar terminology linking an air carrier's certification to that part of the FAA regulations under which the carrier has authority to operate.  On its website, the FAA refers "14 CFR Part 121 Air Carrier Certification."  Likewise, the DOT utilizes the terminology "Part 121 certification from the FAA."

14 C.F.R. § 110.2 (Emphasis added.)  The regulation goes on to list four types of *airplanes*.  *Id.*  Notably, the definition of "supplemental operation" does not encompass rotorcraft operations.  *See id.*

**¶15**          Conversely, the FAA defines "commuter operation" to specifically include rotorcraft operations:

> Commuter operation means any scheduled operation conducted by any person operating one of the following types of aircraft with a frequency of operations of at least five round trips per week on at least one route between two or more points according to the published flight schedules:
>
> (1) Airplanes, other than turbojet-powered airplanes, having a maximum passenger-seat configuration of [nine] seats or less, excluding each crewmember seat, and a maximum payload capacity of 7,500 pounds or less; or
>
> (2) **Rotorcraft**.

14 C.F.R. § 110.2 (Emphasis added.).  Likewise, the regulations define "on-demand operation" to include "any rotorcraft operation."  14 C.F.R. § 110.2.[6]

---

[6]     The FAA amended the regulations applying to air carrier operations and certification in 1995.  *See* Commuter Operations and General Certification and Operations Requirements, 60 Fed. Reg. 65,832 (Dec. 20, 1995) (to be codified at 14 C.F.R. pts. 91, 119, 121, 125, 127 and 135).  The FAA's stated intent was to include rotorcraft operations under Part 135, not Part 121.  *See id.*  As noted in the Federal Register:

> The FAA proposed that part 121 requirements would apply to all scheduled passenger-carrying operations for compensation or hire in **airplanes** with a passenger-seating configuration of [ten] or more seats and to all scheduled passenger-carrying operations for compensation or hire in turbojet-powered **airplanes** regardless of seating capacity. . . Under the proposal, scheduled passenger-carrying operations in non-turbojet airplanes with [nine] or fewer passenger seats, on-demand operations with airplanes with [thrity] or fewer passenger seats, operations in single-engine

¶16 Papillon provides scheduled and on-demand flights in Arizona and Nevada using helicopters (rotorcraft). By definition, Papillon's rotorcraft operations are not "supplemental operations" under the FAA regulations. Rather, as evidenced by its authorization to operate under Part 135 (not Part 121), Papillon's rotorcraft operations are commuter and on-demand operations. Accordingly, the statutory exemption for the holder of a "**supplemental** air carrier certificate under federal aviation regulations" cannot be applied to Taxpayers in this case.

## II. Legislative History

¶17 Taxpayers argue that the language of the statutory exemption is ambiguous, and, therefore, we must determine the intent of the Legislature by reference to legislative history.

¶18 We do not find the language of the statute ambiguous. Moreover, we find that the legislative history reflects an understanding that "supplemental operations" are authorized under Part 121 of the FAA regulations. The minutes of a meeting by the Committee on Ways and Means reflect as follows:

> [T]he [DOT] issues Certificates of Public Convenience and Necessity under Section 401, which contains the current exemptions 418 (domestic air cargo) and 298 (air tax operations). In addition, the [FAA] issues certificates. **The supplemental air carrier is under Part 121, which is charter or cargo, and most of the small airlines in Arizona are under Part 121**.

Minutes of Meeting on H.B. 2624, H.R. Comm. on Ways and Means, 44th Leg., 2nd Reg. Sess. (2000) (Emphasis added.)

¶19 The legislative history does not refer to Part 135 or to commuter and on-demand operations. That is not to say that the same reasoning that prompted the Legislature to carve out an exemption for air carriers authorized to operate under Part 121 would not also justify an exemption for air carriers authorized to operate under Part 135. It well may. Nevertheless, it is for the Legislature, not this court, to extend the scope of this exemption. *See Meyers v. Rosenzweig*, 27 Ariz. 286, 289, 232 P. 886, 887

---

airplanes, and **operations in rotorcraft would continue to be under part 135**.

*Id.* (Emphasis added.)

(1925) ("We do not feel at liberty to extend by interpretation the exemption asked for in this case.").

**CONCLUSION**

**¶20** For the foregoing reasons, we affirm the decision of the tax court awarding summary judgment in favor of the Department.



Ruth A. Willingham · Clerk of the Court
FILED: ama